**In re Albert DOWDEN, Juanita Dowden, Debtors.**

**No. 10–51914.**

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

March 26, 2010.

Matthew J. Thompson, Nobile & Thompson Co., L.P.A., Hilliard, OH, for Debtor.

*ORDER ON DEBTORS' MOTION FOR EXTENSION OF AUTOMATIC STAY*

C. KATHRYN PRESTON, Bankruptcy Judge.

This matter came before the Court on March 19, 2010 for evidentiary hearing upon the Debtors' Motion for Extension of Automatic Stay (Doc # 9) (the "Motion") filed by Albert Dowden and Juanita Dowden, the Debtors in this Chapter 13 case. Objections thereto were filed by First Community Bank (Doc # 20) and Guernsey Bank (Doc # 21). Present at the hearing were the Debtors, attorney Matthew Thompson representing the Debtors, attorney David A. Skrobot as counsel for First Community Bank ("Community") with a representative of Community, and attorney Mary Jane McFadden as counsel for Guernsey Bank ("Guernsey") with a representative of Guernsey.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and the general Order of Reference entered in this District. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

Based upon arguments presented and evidence adduced at the hearing, the Court makes the following findings of fact and conclusions of law.

**I. Findings of Fact.**

The Debtors own certain real estate in Columbus Ohio, known as 1400–1410 Williams Road, 1440 Williams Road, 1280 Williams Road and 2270 Williams Road (collectively, the "Property"). It appears that Community and Guernsey both hold mortgages on the first two properties, and Community holds a mortgage on the latter two properties. The Debtors earn income from leasing the Property to Martin Dowden Army & Navy Garrison, a veterans organization ("Garrison"), and Martin Dowden Charity Fund, Inc. ("Charity"). The leases provide that each organization will pay rent of $7000 per month. Garrison derives its income from operation of a restaurant and bar, and gaming under license from the State of Ohio. Charity previously operated a health care service for the community but has had to close that facility. Charity has applied for gaming licensure from the State of Ohio, but the license(s) have not yet been granted and issued. Debtor Mr. Dowden does not know the status of the application and cannot state with certainty when a decision will be made on the application, although he asserts that the State has not requested additional information, that no news is good news and that in his experience, the license should be issued within 30 days. There is no evidence that Charity current-

ly produces any income from which it can meet its obligations under the lease with the Debtors.[1]

The instant Chapter 13 case is the first in a series of cases filed by the Debtors, beginning with a case filed under Chapter 11 of the Bankruptcy Code on November 29, 2006, case number 06–56925. On July 10, 2007, this Court entered an order setting a deadline of August 20, 2007 for the Debtors to file a plan of reorganization and a disclosure statement. At about the same time, the United States Trustee filed a motion to dismiss the case on the basis that the Debtors had failed to comply with previous orders of court, had failed to file monthly operating reports, had failed to file a plan of reorganization, and were using cash collateral without appropriate court authorization. Although the Debtors initially objected to the United States Trustee's motion, they later withdrew the objection and on August 21, 2007, that case was dismissed.

On November 14, 2007, the Debtors filed their first Petition for Relief under Chapter 13 of the Bankruptcy Code, case number 07–59248 (the "2007 case"). In December of that year, they commenced payments under their proposed plan and in due course, a Chapter 13 plan was confirmed. However, by July 2008 the Debtors had begun making payments late, albeit within the month due. Starting December 2008 they became increasingly delinquent in payments. They attribute the payment problems to road construction which closed part of the Williams Road, severely impeding access to Garrison's and Charity's facilities for 30 days in May–June 2009 and for three months from August to November 2009. Due to the road closure, customers had to drive five miles out of their way in order to gain entry to the Property. To combat the perceived adverse effect of the construction, Garrison began giving away prizes, meals, promotional items and perhaps other things, having a value of almost $74,000 from June to December. The value of meals given away comprised $26,000 of the total value of the giveaways. Nevertheless, according to the Debtors, income of Garrison and Charity was deleteriously impacted, resulting in inability of the businesses to pay rent to the Debtors. Consequently, the Debtors were unable to make their plan payments, and the case was ultimately dismissed on December 17, 2009 for default under the plan. Before dismissal, the Debtors had paid over $310,000.00 into the plan. Notwithstanding, they were delinquent approximately $81,000, representing over seven months of payments.[2]

The road construction was completed in November 2009 and Garrison ceased the giveaways as of an unknown date in December. Debtor Mr. Dowden insists that Garrison's income is rebounding to the 2008 levels. While Mr. Dowden presented a credible story, the income information indicates that this is not the whole story, and simply does not bear it out the Debtors' explanation for Garrison's financial woes. Recall that the construction took place in May–June, then August–November. When comparing 2008 monthly gaming income to 2009 gaming income, impact from the construction does not manifest

---

1. Under the leases, Garrison and Charity are also responsible for payment of the property taxes and appropriate insurance coverage.

2. It should be noted that the source of one payment of approximately $39,000 made by the Debtors was derived from the City of Columbus for an eminent domain taking of an interest in the Property, rather than from Debtors' operations.

itself as one might expect. In fact, during some months of the construction, gaming income actually increased (e.g., May, September and October). Conversely, in certain months in which there was no construction, gaming income inexplicably, and sometimes dramatically decreased (e.g., January, February, July, and December). The comparison of net income from gaming is as follows: [3]

| | 2008 gaming | 2009 gaming |
|---|---|---|
| January | $ 43,469 | $ 18,899 |
| February | 27,960 | 19,033 |
| March | 28,620 | 27,569 |
| April | 27,156 | 28,891 |
| May | 25,086 | 26,307 |
| June | 27,138 | 22,301 |
| July | 28,538 | 26,331 |
| August | 21,767 | 20,644 |
| September | 24,101 | 28,086 |
| October | 26,268 | 32,886 |
| November | 26,616 | 10,180 |
| December | 28,322 | 12,591 |
| TOTALS | 335,041 | 273,718 |

Income derived from food and beverage sales were more heavily impaired during the months of August through November, possibly due to the construction, but other months reflected surprising decreases in sales as well (see, e.g., January, April, July and December), whereas May saw a slight increase and June suffered little adverse impact:

| | 2008 | 2009 |
|---|---|---|
| January | $ 23,657 | $ 22,388 |
| February | 22,554 | 22,075 |
| March | 25,018 | 22,890 |
| April | 21,213 | 18,509 |
| May | 21,117 | 21,477 |
| June | 19,101 | 17,881 |
| July | 18,115 | 17,758 |
| August | 20,805 | 15,077 |
| September | 21,656 | 14,059 |
| October | 19,427 | 14,970 |
| November | 22,981 | 17,220 |
| December | 22,516 | 14,780 |
| TOTALS | 258,160 | 219,084 |

The cost of goods attributable to the food and beverage business in 2008 was $136,099, resulting in net income of $122,061. Gross sales in 2009 were about $40,000 less than 2008, but the cost of meal give-aways of $25,960 should be added to the sales number, bringing the total to $245,044. Still, curiously, the cost of goods in 2009 totaled $136,401, higher than 2008, despite a fairly substantial decrease in sales. Food and beverage net income in 2009 was $82,683.

Despite Mr. Dowden's prediction about rebounding sales, January and February 2010 garnered gaming net income of only $16,731 and $14,310, respectively. Food and beverage sales are similarly down from 2008 and 2009 levels: gross sales of $14,336, leaving Garrison with net income of only $2512 in January, and gross sales of $15,142, leaving net income of $2790 in February.[4] The total net income generated by Garrison has been trending down during the years for which information was provided, while costs of sales has been evidently increasing.

The instant Chapter 13 case was initiated by the Debtors on February 25, 2010. Because § 362(c)(3) provides that, under certain circumstances, the automatic stay will expire 30 days after commencement of the case, the Debtors quickly filed the instant Motion requesting that the Court extend the automatic stay as to all creditors.

---

3. Figures have been rounded to the nearest whole dollar. Some totals differ from the totals reflected on exhibits due to addition errors on the exhibits.

4. In 2008, Garrison's cost of sales was 52% of its gross food and beverage income. Thus far in 2010, Garrison's cost of sales is a whopping 82%.

## II. Conclusions of Law.

### A. The Debtors Fail to Show that the Case was Filed in Good Faith.

Section 362(c)(3) of the Bankruptcy Code provides in pertinent part and with certain exceptions not applicable here, that if a debtor was a debtor in a preceding case dismissed within one year prior to commencement of the current case,

(A) the [automatic] stay ... with respect to any action taken with respect to a debt or property securing such debt or with respect to any lease shall terminate with respect to the debtor on the 30th day after the filing of the later case;

(B) on the motion of a party in interest for continuation of the automatic stay and upon notice and a hearing, the court may extend the stay in particular cases as to any or all creditors (subject to such conditions or limitations as the court may then impose) after notice and a hearing completed before the expiration of the 30–day period only if the party in interest demonstrates that the filing of the later case is in good faith as to the creditors to be stayed; and

(C) for purposes of subparagraph (B), a case is presumptively filed not in good faith (but such presumption may be rebutted by clear and convincing evidence to the contrary)—

(i) as to all creditors, if—

(I) ...

(II) a previous case under any of chapters 7, 11, and 13 in which the individual was a debtor was dismissed within such 1–year period, after the debtor failed to—

(aa) file or amend the petition or other documents as required by this title or the court without substantial excuse (but mere inadvertence or negligence shall not be a substantial excuse unless the dismissal was caused by the negligence of the debtor's attorney);

(bb) provide adequate protection as ordered by the court; or

(cc) perform the terms of a plan confirmed by the court; or

(III) there has not been a substantial change in the financial or personal affairs of the debtor since the dismissal of the next most previous case under chapter 7, 11, or 13 or any other reason to conclude that the later case will be concluded—

(aa) ...

(bb) if a case under chapter 11 or 13, with a confirmed plan that will be fully performed[.]

 To be confirmed, a Chapter 13 plan must be proposed in good faith. 11 U.S.C. § 1325(a)(3). The Sixth Circuit Court of Appeals has suggested a twelve-part test to determine whether the debtor's Chapter 13 plan is proposed in good faith. Courts have adopted this test for assessing good faith under § 362(c)(3). The elements of the test are:

(1) the amount of the proposed payments and the amount of the debtor's surplus;

(2) the debtor's employment history, ability to earn and likelihood of future increase in income;

(3) the probable or expected duration of the plan;

(4) the accuracy of the plan's statements of the debts, expenses and percentage repayment of unsecured debt and whether any inaccuracies are an attempt to mislead the court;

(5) the extent of preferential treatment between classes of creditors;

(6) the extent to which secured claims are modified;

(7) the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7;

(8) the existence of special circumstances such as inordinate medical expenses;

(9) the frequency with which the debtor has sought relief under the Bankruptcy Reform Act;

(10) the motivation and sincerity of the debtor in seeking Chapter 13 relief;

(11) the burden which the plan's administration would place upon the trustee; and,

(12) whether the debtor is attempting to abuse the spirit of the Bankruptcy Code.

*Hardin v. Caldwell (In re Caldwell),* 895 F.2d 1123, 1126–27 (6th Cir.1990); *Metro Employees Credit Union v. Okoreeh-Baah,* 836 F.2d 1030, 1032 n. 3 (6th Cir. 1988). However, the Sixth Circuit Court of Appeals emphasized in both *Caldwell* and *Okoreeh-Baah* that the Bankruptcy Court must look to the totality of the circumstances in determining a debtor's good faith in filing a Chapter 13 petition and plan. As stated by the court in *Okoreeh-Baah,* good faith is an amorphous notion, largely defined by factual inquiry. *Okoreeh-Baah,* 836 F.2d at 1033.

■ In the instant case, the presumption arises that the case was not filed in good faith, because the previous case was dismissed due to the Debtors' failure to perform the terms of a plan confirmed by the Court. The presumption also arises because the Debtors have failed to show that there has been a substantial change in their financial or personal affairs since the dismissal of the previous case, or any other reason to conclude that the current case will be concluded with a confirmed plan that will be fully performed. Although Debtor Mr. Dowden is optimistic that Charity will be awarded the gaming licenses for which it has applied, the licenses have not yet been granted or issued, and there is insufficient evidence if or when the application may be granted. Additionally, while termination of the give-away program by Garrison may result in a change to the Debtors' financial affairs in that Garrison may be able to make rent payments, the evidence is too vague for the Court to determine whether that program ceased prior to or after the 2007 case was dismissed in December 2009, which is the criteria enunciated by the statute. Even if the program terminated after the dismissal of the prior case, it has not resulted in positive impact to Garrison thus far, from which Garrison can make its rent. The Court cannot envision and the Debtors did not explain how Garrison can make rent payments in light of the dismal operational performance reflected by the evidence. Indeed, there is no testimony that it has done so.

The presumptions can only be overcome by clear and convincing evidence that the Debtors are proceeding with good faith. Little evidence was presented by the Debtors in support of the criteria articulated by the Sixth Circuit Court of Appeals, aside from information regarding their potential income and the possibility of increases. On that point, Mr. Dowden explained that the Debtors should receive $14,000 from rental of the Property to Garrison and Charity, according to the lease agreements. Additionally, the Debtors indicated that they expect to increase the rent. However, as explained above, the evidence does not support Mr. Dowden's expectation of rental income from which he expects to service the Chapter 13 plan payments. Garrison simply does not create the income necessary to pay the rent consistently. Moreover, Charity is not a realistic source of rental income. It produces no income currently, and the gaming licenses have not been issued. Aside from

that problem, there is insufficient evidence regarding the anticipated stream of income to be generated by Charity from the potential gaming operations. Mr. Dowden stated that Charity should generate approximately $2400 per week, but presented no evidence pertaining to the costs of conducting that business, no pro forma or other estimate of future business operations was submitted. The testimony regarding possible increases in rent was simply too vague to lend any strength to the Debtors' position: the Debtors failed to explain when, how much or whether the market could bear such an increase.

Finally, the Debtors pointed out that Mrs. Dowden earns outside income and that Mr. Dowden receives social security retirement income. No evidence was given, however, as to the amount of this other income, and Mr. Dowden admitted that Mrs. Dowden's income is sporadic. This indicates to the Court that her income is unreliable. Yet, according to their Schedules I and J, feasibility of the Debtors' plan payment appears to rely on that income in addition to the expected rent.

Perhaps inadvertently, the Debtors provided some evidence regarding their motivation in seeking Chapter 13 relief. It appears that the Debtors' motivation for seeking Chapter 13 relief is to provide breathing room for adjustment of the business model of their primary sources of income (i.e., Garrison and Charity) so that they may receive a steady stream of income therefrom. Once the spigot to this stream of income is turned on, with the assistance of the Chapter 13 relief, the Debtors indicated through their Chapter 13 plan a desire to pay their creditors. This goal is further indicated by the payments made during the previous bankruptcy proceeding while the businesses were turning a profit (or at least able to meet their rent obligations).

At the conclusion of the hearing, the Court indicated to the parties that it would take judicial notice of the case file, to which the parties voiced no objection. Setting aside the question of feasibility described above, review of the documents filed thus far indicate that the Debtors are proposing to dedicate all of their disposable income to plan payments and anticipate no surplus, the plan proposes to pay a dividend of five percent to unsecured creditors, the plan does not appear to provide for any suspect preferential treatment between classes of creditors, and the plan otherwise appears to comply with the requirements of the Bankruptcy Code (other than the requirement of feasibility). These factors support a finding that the Debtors filed the instant case in good faith.

There is no evidence regarding the other factors to be considered: the probable or expected duration of the plan; the accuracy of the Debtors' statements of affairs or schedules and whether any inaccuracies are an attempt to mislead the court; the extent to which secured claims are modified; the type of debt sought to be discharged and whether any such debt is nondischargeable in Chapter 7; the existence of special circumstances such as inordinate medical expenses; the sincerity of the debtor in seeking Chapter 13 relief; the burden which the plan's administration would place upon the trustee; and whether the Debtors are attempting to abuse the spirit of the Bankruptcy Code. The Court views some of these elements of the Sixth Circuit's test as critical to its evaluation of the Debtors' good faith. Additionally, the Court is troubled that the Debtors have filed two prior unsuccessful bankruptcy cases, the first of which utterly failed and the second of which achieved only minimal success for a short period. Given the totality of the circumstances, the evidence falls short of clear and convincing as is

required to overcome the presumptions that this case was not filed in good faith. Therefore, the Court must deny the Debtors' Motion to extend the automatic stay.

### B. The Scope of Termination of the Automatic Stay Under § 362(c)(3).

Since there are few cases from this District interpreting the relief provided under § 362(c)(3), the Court will take this opportunity to explain the scope of termination of the automatic stay upon the 30th day after this case was commenced.

Of course, pursuant to § 362(a), the filing of a petition for relief under any chapter of the Bankruptcy Code operates as a stay of virtually any act to collect a debt or gain control of an interest in property of the estate. But for the special provisions of § 362(c)(3) and (4), the stay generally remains in effect with respect to the Debtor during the pendency of the case until discharge is granted or denied, and with respect to property of the estate until it is no longer property of the estate. See 11 U.S.C. § 362(c)(1) and (2). Section 362(c)(3)(A) provides that, in cases such as this one, "the stay . . . with respect to any action taken with respect to a debt or property securing such debt . . . shall terminate **with respect to the debtor** on the 30th day after the filing of the later case." 11 U.S.C. § 362(c)(3)(A)(emphasis added). This language differs materially from the language of § 362(c)(4)(A)(i). That section provides that "if a single or joint case is filed by or against a debtor who is an individual under this title, and if 2 or more single or joint cases of the debtor were pending within the previous year but were dismissed, . . . the stay under subsection (a) shall not go into effect upon the filing of the later case[.]" 11 U.S.C. § 362(c)(4)(A)(i).

Resolving questions of interpretation of a recently enacted statute begins where all such inquiries must begin: with the language of the statute itself. *United States v. Ron Pair Enters.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) (citation omitted). "It is well established that when the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to enforce it according to its terms." *Lamie v. United States Tr.*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004) (internal quotation marks omitted) (citations omitted). "[W]here the statutory language is clear and unambiguous, the Court may not speculate as to Congress' purpose; if, however, the language is ambiguous or would lead to an absurd result, the Court may try to discern legislative intent." *In re Payne*, 347 B.R. 278, 281–82 (Bankr.S.D.Ohio 2006) (citation omitted). Furthermore, "interpretations of a statute which would produce absurd results are to be avoided if alternative interpretations consistent with the legislative purpose are available." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S.Ct. 3245, 73 L.Ed.2d 973 (1982) (citation omitted). The Supreme Court has observed "time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l. Bank v. Germain*, 503 U.S. 249, 253–54, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). The Sixth Circuit Court of Appeals has also instructed us that statutes "must be read in a 'straightforward' and 'common sense' manner," and that if the court can "discern an unambiguous and plain meaning from the language of [the statute], [the] task is at an end." *Rogers v. Laurain (In re Laurain)*, 113 F.3d 595, 597 (6th Cir.1997) (citations omitted). Importantly, " '[when] Congress includes particular language in one section of a statute but omits it in another, . . . it is

 

generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Keene Corp. v. United States,* 508 U.S. 200, 208, 113 S.Ct. 2035, 124 L.Ed.2d 118 (1993) (citation omitted).

 Thus, § 362(c)(3)(A) has been construed by courts as eliminating the automatic stay "as to the debtor, but not as to the property of the estate...." *In re Murray,* 350 B.R. 408, 414 (Bankr.S.D.Ohio 2006). See also *In re Jones,* 339 B.R. 360 (Bankr.E.D.N.C.2006). Juxtaposing the language of the two sections reveals Congress' intent to limit the scope of the relief from the automatic stay granted in § 362(c)(3)(A). While the impact of the introductory phrase laying the premise for relief may be unclear ("with respect to any action taken with respect to a debt or property securing such debt"), the operative phrase that the stay "shall terminate with respect to the debtor" is absolutely clear, unambiguous and not absurd in its application. If Congress had intended to allay all of the protections of the automatic stay by operation of § 362(c)(3)(A), it could easily have done so by use of language similar to that set forth in § 362(c)(4)(A)(I). *Murray,* 350 B.R. at 414; *Jones,* 339 B.R. at 364. Therefore, the limiting language included in § 362(c)(3)(A) dictates that the automatic stay is terminated "with respect to actions taken against the debtor ..., but does not terminate the stay with respect to property of the estate." *Jones,* 339 B.R. at 365 (citing *In re Johnson,* 335 B.R. 805, 806 (Bankr.W.D.Tenn.2006)). But see *In re Jupiter,* 344 B.R. 754 (Bankr.D.S.C.2006).

### III. Conclusion.

In accordance with the foregoing, it is ORDERED that the Debtors' Motion for Extension of Automatic Stay (Doc # 9) hereby is DENIED, and the stay imposed by § 362(a) shall expire on March 27, 2010 to the extent set forth in § 362(c)(3)(A).

IT IS SO ORDERED.